**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| SANDRA L. SQUIER,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW M. SAUL, Commissioner of Social Security,[1]<br><br>Defendant. | No. 18-CV-3026-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |

_____

## I. INTRODUCTION

This case is before me on a Report & Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge. Doc. No. 21. Judge Mahoney recommends that I affirm the decision of the Commissioner of Social Security (the Commissioner) denying plaintiff Sandra Squier's application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et. seq. Squier filed timely objections to the R&R. Doc. No. 22. The Commissioner has not responded.

## II. APPLICABLE STANDARDS

### A. *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact,

_____

[1] Andrew M. Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), he has been substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003) (quoting *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998)). The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)).

To determine whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court "must search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003). However, the court does not "reweigh the evidence presented to the ALJ," *id.* at 555, or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citation omitted).

If, after reviewing the evidence, the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even if the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (citation omitted). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is

not subject to reversal simply because some evidence may support the opposite conclusion.").

B.  *Review of Report and Recommendation*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

3

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. THE R&R

Squier applied for DIB on July 1, 2014, alleging major depressive disorder, post-traumatic stress disorder (PTSD), Factor V Leiden thrombophilia[2] and anxiety. *See* AR at 72. Her alleged onset date is February 17, 2014, which Judge Mahoney notes "coincides with treatment after a fall at work and the development of blood clots and pulmonary emboli." Doc. No. 21 at 1 (citing AR at 72, 362, 369–70). Squier's initial application was denied on August 15, 2014, and, after reconsideration, denied again on December 4, 2014. *See* AR at 71–103. After a hearing, an Administrative Law Judge (ALJ) applied the familiar five-step evaluation and found that Squier suffers from "severe impairments" that "constitute more than slight abnormalities and have more than a minimal effect on the claimant's ability to perform basic work activities for a continuous period of 12 months or greater." *Id*. at 13. However, the ALJ ultimately held that Squier's impairments do not "meet[] or medically equal the severity" of applicable listed impairments and that, although her RFC renders her incapable of performing past relevant work, Squier is "not disabled" because she "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id*. at 14–21. Squier argues that the ALJ erred in reaching this conclusion because (1) the ALJ failed to properly evaluate the combined effects of Squier's impairments in determining her RFC, including her possible conversion disorder, and (2) the ALJ who decided Squier's claim was not properly appointed as required by the United States Supreme Court's recent interpretation of the Appointments Clause in *Lucia v. SEC*, 138 S. Ct. 2044 (2018). Doc. No. 17 at 2.

---

[2] *See* Factor V Leiden, Stedmans Medical Dictionary 318320 (Westlaw 2014) ("[V]ariant of the protein factor V (5), a clotting factor. Factor V Leiden gene is present in 3% of the general population. People who carry the factor V Leiden gene have a fivefold greater risk of thrombosis than the rest of the population.").

4

Regarding Squier's first argument, Judge Mahoney noted that the ALJ not only considered Squier's impairments in isolation, "but also outlined the medical record and opinions and specifically noted that he considered the combined effects of Squier's impairments in determining her RFC." Doc. No. 21 at 4. Further, Judge Mahoney stated that Squier's reliance on a treatment note[3] from her pulmonologist was misplaced because the pulmonologist expressly stated that "Squier's impairments individually were not disabling[] and merely explained that a person's combined impairments *may* be disabling." *Id.* The pulmonologist did not provide a true medical opinion as to whether— or the extent to which—Squier's impairments in combination caused disabling limitations. *See id.*

Judge Mahoney next addressed Squier's arguments regarding the lack of discussion about Squier's possible conversion disorder in the ALJ's decision. *Id.* at 4–8. After acknowledging that conversion or somatoform disorder is an impairment that has been recognized in disability cases, Judge Mahoney found that the record contained only "limited evidence" that "Squier might suffer from possible conversion disorder." *Id.* at 5. Among the limited evidence that exists, Judge Mahoney noted that none came from treating physicians.[4] *Id.* The fact that Squier referenced "conversion disorder as a 'potential' condition" and "did not allege [it] as an impairment in either her application or at the administrative hearing" were also significant to Judge Mahoney. *Id.* (citing

---

[3] Judge Mahoney noted that the pulmonologist, Dr. Levinson, did not provide an actual treating source statement or otherwise make specific findings regarding Squier's functional limitations as would be required under the social security regulations to be a medical opinion. *See* Doc. No. 21 at 4; *see also* 20 C.F.R. § 404.1527 ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

[4] Judge Mahoney noted that "[n]o treating physician discussed or diagnosed conversion disorder," a fact she found distinguished Squier's case from the cases Squier cited as support. Doc. No. 21 at 5–6. The only diagnosis of conversion disorder came from an examination related to Squier's workers' compensation case. *Id.*

*Dunahoo v. Apfel*, 241 F.3d 1033, 1039–40 (8th Cir. 2001) (finding claimant's failed to allege depression in her application was "significant," even though evidence of the impairment was later developed)).

Finally, Judge Mahoney explained that Dr. Ascheman, the medical source Squier primarily relies on for her argument, reported that Squier had dealt with and worked through depression, anxiety and the type of "ruminative thinking" that is often associated with conversion disorder long before her alleged onset date. *Id.* at 7 (quoting AR at 235).

> Dr. Ascheman believed Squier's "preexisting major depressive disorder" was aggravated by her perceived mistreatment, not her fall, and that her "concerns about recurrent blood clots [were] consistent with [Squier's] pre-existing ruminative thinking, excessive health concerns, and did not substantially factor into the severity of her depression in comparison to other unrelated and recurrent life stressors." He ultimately concluded that Squier's ruminative thinking was "within her abilities to regulate were she to seek to do so" and that her "negativistic attitude appears to be somewhat characterological and does not necessitate any specific [medical] restrictions."

*Id.* at 6–7 (citations omitted). This, combined with evidence showing Squier's daily and recreational activities were inconsistent with and "undercut her statements about the intensity, persistence, and limiting effects of her symptoms," led Judge Mahoney to conclude that the ALJ did not err in his conclusions regarding the combined effects of Squier's impairments or her possible conversion disorder. *Id.* at 7–8.

With respect to Squier's Appointments Clause argument, Judge Mahoney noted that "[e]very district court in the Eighth Circuit to address the issue (including the Northern District of Iowa) has found a Social Security claimant's Appointments Clause challenge raised for the first time on judicial review to be forfeited." *Id.* at 11. Because Squier presented no new arguments not already addressed by that precedent, Judge Mahoney recommends rejecting Squier's Appointments Clause challenge. *Id.* at 11.

## IV. ANALYSIS

Squier's objections to the R&R largely echo the arguments raised in her principal brief. Squier argues that Judge Mahoney erred by (1) finding that the ALJ properly considered the combined effects of Squier's impairments in determining Squier's RFC and that the ALJ did not err by omitting Squier's possible conversion disorder therefrom and (2) concluding that Squier's Appointments Clause challenge was forfeited. Doc. No. 22 at 2–4, 8. Squier first argues the ALJ should have developed the record regarding the combined effect of Squier's impairments more fully. *Id.* at 2–4. She places particular emphasis on the effects of obesity when combined with other impairments and the need to evaluate the effects of possible conversion disorder. *Id.* In her second objection, Squier asks me to reconsider the precedent regarding the ability of a Social Security claimant to raise Appointments Clause challenges against an ALJ for the first time in federal district court. *See id.* at 4–8. Squier asks that I remand this case for further proceedings to develop the record regarding her impairments and limitations in connection with her RFC with a properly appointed ALJ. *Id.* at 8. I will review each issue de novo. *See* 28 U.S.C. § 636(b)(1).

### A. *The Combined Effect of Squier's Impairments and Possible Conversion Disorder*

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. An individual has a disability when, due to his physical or mental impairments, he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step

sequential evaluation process outlined in the regulations. 20 C.F.R. § 404.1520; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

Squier's arguments center on the ALJ's RFC determinations and subsequent step-five conclusions,[5] as she contends that the ALJ did not properly consider the combined effects and limitations of her impairments. *See* Doc. No. 22 at 2. Because Squier argues that a possible conversion disorder is one of the impairments the ALJ should have considered in determining the combined effects of her impairments, I will address the conversion disorder issue first.

### 1. *Conversion Disorder*

Squier argues that the ALJ failed to fully and fairly develop the record regarding Squier's possible conversion disorder in determining her RFC and, as a result, improperly found her to be not disabled. *See* Doc. No. 17 at 5–8; Doc. No. 22 at 3. Squier also argues that by failing to consider her possible conversion disorder, the ALJ did not accurately evaluate the credibility of her self-reported limitations, such as the need to elevate her feet. Doc. No. 17 at 5. Conversion disorder, also known as somatoform disorder, "is a phenomenon in which a person actually and subjectively experiences symptoms without a known underlying medical cause." *Nowling v. Colvin*, 813 F.3d 1110, 1113–14 (8th Cir. 2016); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.07 (2014). It may also "cause[] [a person] to believe that her physical ailments are more serious than the clinical data would suggest." *Easter v. Bowen*, 867 F.2d 1128,

---

[5] Squier failed to clearly specify the full scope of what she challenges. Judge Mahoney wrote:

> Squier argues the ALJ erred by failing to develope [sic] the record to consider how conversion disorder might have impacted her ability to work . . . but she does not argue the ALJ erred by failing to find that Squier suffers from conversion disorder (either as a severe impairment in considering the listings or as a medically determinable impairment in determining RFC).

Doc. No. 21 at 5 (citation omitted). I agree with Judge Mahoney's conclusion that Squier's main contention lies with the ALJ's development of the record related to the RFC determination.

1129 (8th Cir. 1989). If the ALJ finds that the claimant suffers from conversion disorder that amounts to a severe impairment under the listings in Appendix 1, the claimant will be found disabled automatically. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.07. Even if a claimant's conversion disorder doesn't amount to a severe impairment under the listings, it may still be relevant in determining the claimant's RFC and disability. *See id.* § 404.1545(a)(2) (noting that even "medically determinable impairments that are not 'severe'" will be considered in determining an RFC).

From the outset, it is important to note that Squier did not allege conversion disorder as a basis for her disability in her initial application or at her hearing before the ALJ. An ALJ has no duty to consider a possible impairment in determining the claimant's RFC when that impairment was not alleged as a basis for disability in the claimant's application or at the hearing and little to no evidence of such impairments is provided. *See, e.g.*, *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) (holding that a claimant "waived" an alleged limitation in function when he had not alleged it in his application or at the hearing); *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993) ("The ALJ . . . had no obligation to investigate a claim not presented at the time of application for benefits and not offered at the hearing as a basis for disability."); *see also Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989) (finding that the ALJ did not err by not ordering a consultative exam when the claimant "did not allege that she was disabled due to any mental impairment" and "[t]he only evidence in the record indicating any emotional problems [was] her testimony that she suffers from 'nerves' and the fact that [her doctor] prescribed Triavil, an anti-depressant medication"); *Davis v. Colvin*, No. 15-4002, 2016 WL 1050285, at *5 (N.D. Iowa Mar. 16, 2016) (finding that the ALJ had no duty to evaluate possible somatoform disorder when it was only "mentioned once in the record and not relied upon as a basis for claiming disability [as] a primary impairment"). This issue alone supports the ALJ's exclusion of Squier's possible conversion disorder in the RFC analysis and credibility determinations.

Even if this omission of possible conversion disorder is not determinative, I agree with Judge Mahoney that the ALJ's RFC determinations are still supported by substantial evidence in the record. The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 (July 2, 1996). When determining a claimant's RFC, ALJs must consider the physical and mental limitations resulting from the claimant's "medically determinable impairments of which [they] are aware." 20 C.F.R. § 404.1545 (2014); *see also id.* § 404.1512 ("We will consider only impairment(s) you say you have or about which we receive evidence."). Even though the ALJ retains the authority and duty to determine the RFC and the ALJ's conclusions "must be supported by some medical evidence, 'the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). To show a medically determinable impairment, the claimant must establish his or her impairment "by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [his or her] statement of symptoms." 20 C.F.R. § 404.1508. If impairments are not medically determinable, the ALJ need not consider them in determining a claimant's RFC. *See* SSR 96-8p ("[I]n assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments."); *see also Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016) ("[T]he ALJ is only required to consider medically determinable impairments in the RFC at step four, whether severe or not . . . .").

Squier relies almost exclusively on the testimony of one medical professional, Paul Ascheman, Ph.D., who examined her a single time in 2017 in connection with her workers' compensation case. *See* Doc. No. 17 at 5–8; AR at 228–37. Dr. Ascheman reviewed Squier's comprehensive mental health record extending long before Squier's alleged onset date and conducted a one-hour interview. AR at 228.

Dr. Ascheman began his report by reviewing and summarizing Squier's mental health records. He stated that Squier has "a substantial history of depressed and anxious mood predating her work injury" and "appears to have a chronic lifelong issue with ruminative thinking and worries about her health and health care" that "frequently resulted in somaticized symptoms." *Id.* at 229. He also stated that Squier has "had a significant number of distressing life circumstances . . . that appear to flare up her mood and . . . somatic symptoms." *Id.* Dr. Ascheman noted that a psychological evaluation performed in 2008, six years before Squier's onset date, by Mark Peltan, Ph.D., was "most precise in describing [Squier's] past and current symptom presentation" and summarized it:

> [Squier] was assessed in 2008 as having DSM-IV diagnoses of major depressive disorder, single episode mild and pain disorder, physical and psychological factors. Dr. Peltan administered the MMPI-2 personality inventory, which he interpreted to be consistent with mild to moderate depression "the extent of which is probably masked by the presence of somatic symptoms." He further noted her test results were "very much like those found among persons who react to stress and emotional conflict through the exacerbation or development of medical problems." Adding, "Their physical symptoms may be fairly specific and may wax and wane depending on their stress level." . . . At that time, she was complaining of chronic migraine headaches, low mood, irritability, and worry. She had poor appetite, was fatigued, and complained of difficulties with concentration. Multiple life stressors were present concurrent with these somatic and mood symptoms.

*Id.* at 230. Agreeing with Dr. Peltan, Dr. Ascheman concluded that "[Squier] has a well-ingrained tendency toward stress-induced medical complaints." *Id.* at 237. This tendency was also revealed by the documentation of somaticized symptoms by her treating physicians multiple times from 2014 to 2016. *See id.* at 231–32.

Dr. Ascheman diagnosed Squier with "Major Depressive Disorder" and also noted that Squier "meets criteria for Somatic Symptom Disorder." *Id.* at 237. He described Squier's condition as "characterized by a persistently high level of anxiety about health, the seriousness of her symptoms, and excessive time spent devoted to monitoring of

symptoms." *Id*. Dr. Ascheman further explained that "[w]hile many of [Squier's] health conditions appear to have medical explanations, others are largely generated due to anxiety and hyperfocus on sensations, which is to say they are somaticized symptoms." *Id*.

Although some treating physicians acknowledged in their treatment notes that Squier presented with somaticized symptoms at times, none of her treating physicians diagnosed her with conversion disorder. Further, their treatment did not focus on Squier's somatization of symptoms. *See id*. at 231–32. Instead, Squier's treatment focused primarily on her depression and addressing "life stressors" that often led to or exacerbated Squier's somaticized symptoms. *Id*. at 232; *see also id*. at 229 (noting that distressing life circumstances flared up Squier's and somatic symptoms). This was an important point for Dr. Ascheman who, in concluding his summary of Squier's mental health records, stated:

> In review of the psychotherapy treatment records as well as records noting mental health concerns pre-dating her work injury, the fact that these patient-lead sessions regularly focused on life stressors unrelated to her work injury suggests that her fall on February 4, 2014 neither substantially caused, contributed to, nor maintained her longstanding mental health conditions. At best, this workplace incident and following medical conditions could be summarized as adding to a list of negative experiences for which the claimant draws upon in ruminative thinking.

*Id*. at 233.

Regarding his own impressions of Squier's mental health, Dr. Ascheman opined that "Squier did not sustain a new mental health condition as a result of her work incident," rather "[s]he has a preexisting major depressive disorder that is sustained by recurrent life stressors that began in early childhood and continue to date." *Id*. at 235. He continued, "her overall symptoms are more characteristic of a severe depressive disorder with psychotic features (i.e., paranoia, somatization)" and "[h]er concerns about recurrent blood clots are consistent with pre-existing ruminative thinking, excessive

health concerns, and did not factor into the severity of her depression in comparison to other unrelated and recurrent life stressors occurring during that time span." *Id.* at 235.

Based on a review of all the evidence in the record, the ALJ's decision to omit Squier's possible conversion disorder from the RFC analysis is supported by substantial evidence. I agree with Judge Mahoney that there is limited evidence in the record that Squier suffers from conversion disorder. There is some evidence that Squier suffers from somaticized symptoms and Dr. Ascheman believed that she met the criteria for conversion disorder. However, the standard of review I must follow does not involve reweighing the evidence or asking if there is substantial evidence that Squier suffers from, and has her abilities limited by, conversion disorder. *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003). Instead, I must consider whether the ALJ's conclusions are supported by substantial evidence.

There is substantial evidence in the record that conversion disorder is not a medically determinable impairment in Squier's case and, therefore, the ALJ did not err by excluding it from the RFC analysis. No treating physician diagnosed Squier with conversion disorder or recommended treatment for it despite awareness of Squier's somaticized symptoms.[6] Dr. Ascheman, despite providing a thorough report, formed his opinions from a one-hour interview and the treatment notes of Squier's treating sources, not as a treating physician. Additionally, Dr. Ascheman opined that based on his own interview and a review of her history, "recurrent life stressors" seemed to play a greater

---

[6] Squier characterizes Dr. Ascheman's summary of Dr. Jen Hansen's treatment records as "generally critical" and that Dr. Ascheman faulted Dr. Hansen's treatment strategy for not addressing her somaticized symptoms. *See* Doc. No. 17 at 6–7. I disagree with that characterization. Dr. Ascheman's statement about the lack of psychotherapy directed at somatization concerns appears more factual than condemning. *See* AR at 232. This is supported by the fact that Dr. Ascheman cites the focus on "life stressors unrelated to her work injury" as evidence that life stressors were the greatest source of Squier's mental health concerns, not her work-related injury. *See id.* at 233.

13

role in the severity of her depression and symptoms than her "concerns about recurrent blood clots." *See id.*

Even if conversion disorder was a medically determinable impairment in Squier's case, substantial evidence still supports the ALJ's omission of possible conversion disorder in the RFC because the record contains little to no evidence of severe limitations caused by conversion disorder. In other words, even if Squier does have conversion disorder, she was not prejudiced by its exclusion from the RFC analysis. Despite acknowledging somatic symptoms occasionally, no treating source ever identified limitations directly stemming from Squier's somatic symptoms. Even Dr. Ascheman, who opined that Squier meets the criteria for somatoform disorder, concluded that the "cognitive and emotional limitations . . . presented by the claimant . . . appear to be self-imposed and secondary to her ruminative thinking" and "are within her abilities to regulate were she to seek to do so." AR at 236. Dr. Ascheman also stated that "[h]er negativistic attitude appears to be somewhat characterological and does not necessitate any specific [medical] restrictions." *Id.*

In addition, as Judge Mahoney pointed out, Dr. Ascheman concluded that Squier's depression and somatic symptoms were longstanding conditions that existed before Squier's alleged onset date. *See* Doc. No. 21 at 7. The fact that Squier worked despite those conditions and symptoms further suggests that there are few if any severe limitations stemming from the somatic-type symptoms that Squier now alleges are manifestations of conversion disorder. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (noting that claimant's testimony of disabling limitations was contradicted by the evidence showing that the claimant worked for over four years despite the alleged limitations); *Dodson v. Chater*, 101 F.3d 533, 534 (8th Cir. 1996) ("Since [the claimant] had been able to work while having the exact same impairments she claimed made her unemployable, she was 'less than fully credible' regarding her inability to work."); *Klein v. Berryhill*, No. 16-1016, 2017 WL 2399574, at *5 (N.D. Iowa June 2, 2017) (affirming

14

that a claimant was not disabled in part due to the fact that the claimant worked despite the alleged impairments).

The last possible source of evidence of limitations comes from Squier herself. Although Squier did not specifically allege conversion disorder in her application or at the hearing, she did show signs of excessive worrying about some of her symptoms and conditions at the hearing, such as blood clotting and the need to elevate her feet. *See* AR at 48, 59. Squier argues that these are manifestations of her conversion disorder and cites to other similar manifestations throughout her medical history. *See* Doc. No. 22 at 3–4; Doc. No. 17 at 5–6. She contends that the ALJ should have inferred from such statements a connection to a possible conversion disorder and erred in evaluating the credibility of these subjective complaints and limitations in the RFC. Doc. No. 17 at 5–6. However, the record does not warrant such an inference in this case.

It is true that the ALJ's decision contains no specific analysis regarding conversion disorder or somaticized symptoms, such as Squier's alleged need to elevate her feet. However, this alone does not mean that they were not adequately considered because, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). The ALJ heard Squier's testimony at the hearing and admitted Dr. Ascheman's report into evidence. *See* AR at 30 (admitting exhibit 9D, the worker's compensation evidence containing Dr. Ascheman's report, at the hearing). The ALJ also referenced exhibits regarding Squier's mental health history, including many that Dr. Ascheman reviewed for his report. *See id.* at 15–20. While the ALJ never explicitly spoke of ruminative thinking, somatic symptoms or conversion disorder, the ALJ expressly considered Squier's depression, anxiety and "excessive worrying." *Id.* at 18–19.

Further, Judge Mahoney correctly noted that the ALJ "was not required to accept Squier's statements about the limiting effects of her impairments." Doc. No. 21 at 7. Personal statements alone are impermissible as a foundation for limitations. *See* 20

15

C.F.R. § 404.1513 (explaining that evidence of impairments must come from acceptable medical sources). Thus, I agree with Judge Mahoney that Squier's testimony at the hearing regarding the need to elevate her legs was left without necessary medical evidence. *See* Doc. No. 21 at 7. With no required evidence supporting Squier's alleged conversion-disorder related limitations, the ALJ did not err by omitting them from the RFC analysis. *See* SSR 96-8p ("[W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.").

For these reasons, I conclude that the ALJ's RFC determinations are supported by substantial evidence despite the fact that they do not account for any alleged limitations caused by conversion disorder.

### 2. *The Combined Effect of Squier's Impairments*

Squier argues that the ALJ did not fully consider the combined effects of her impairments on her breathing issues. Doc. No. 22 at 2–3. Specifically, she argues that obesity, in combination with other impairments, causes shortness of breath and fatigue that the ALJ's RFC did not accurately reflect. *Id.* In his decision, the ALJ stated that he considered "the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments." AR at 15. Regarding obesity and shortness of breath concerns, the ALJ concluded that the record "fail[ed] . . . to document significant associated complications such as . . . shortness of breath . . . specifically attributable to the claimant's body habitus." *Id.* at 18.

Social Security Ruling 96-8p requires an ALJ to evaluate the combined effect of a claimant's medically determinable impairments and related symptoms when determining the claimant's RFC. SSR 96-8p. Social Security Ruling 02-1p explains that not only can obesity on its own cause limited function, but also "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p,

16

2002 WL 34686281 (May 15, 2000) (rescinded and replaced).[7] "For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." *Id.*

Based on my de novo review of the record, I cannot say that the ALJ's RFC determinations lack substantial evidence or that the ALJ failed to evaluate the combined effects of Squier's impairments. The ALJ did not find evidence that Squier's COPD and shortness of breath were severe. In fact, the ALJ noted that Squier's medical history reflected test results of only mild obstruction and, despite having more serious conditions that had been resolved, Squier's exams generally revealed that she had "clear lungs." AR at 16–17.

Although obesity can exacerbate symptoms caused by other impairments, the record in this case does not suggest such a circumstance. In her objections, Squier points to only one medical note in which a physician wrote that "deconditioning" was a likely cause of Squier's shortness of breath and fatigue. Doc. No. 22 at 2 (citing AR at 226). However, the same note states that smoking is also a likely cause of Squier's shortness of breath, smoking caused Squier's COPD in the first place and that the physician urged Squier to quit smoking. *See* AR at 226. Unlike the example from SSR 02-1p, in which obesity directly intensified the pain of arthritis in a joint by increasing pressure on that joint, the record does not establish a nexus between Squier's obesity and her conditions of COPD and shortness of breath to justify a finding of increased limitation.[8] Furthermore, as Judge Mahoney and the ALJ acknowledged, any such potential nexus is overshadowed by the substantial evidence in the record attributing the vast majority of

---

[7] SSR 02-1p has since been rescinded and replaced by SSR 19-2p. SSR 19-2p, 2019 WL 2374244 (May 20, 2019). Squier cites to the new ruling in her objections. *See* Doc. No. 22 at 2. However, SSR 02-1p was in effect at all times during Squier's proceedings and still applies here.

[8] SSR 02-1p suggests that such a nexus could be shown by discussing "where the excess weight is carried" and the systemic or functional limitations that obesity causes the individual. *See* SSR 02-1p.

Squier's breathing issues to past and continued smoking. *See, e.g.*, *id.* at 398, 529, 602–04.

Finally, in his RFC analysis the ALJ pointed to evidence that Squier's "ability to engage in a variety of daily activities" refuted any need to find greater limitations. *Id.* at 19. Squier herself, during an exam by Paul Conte, M.D., "state[d] that neither her legs or her breathing prevent her from working, or doing activities of daily life." *Id.* at 224.[9] The ALJ did not fail to evaluate the combined impact of Squier's impairments. Substantial evidence supports the ALJ's findings as to Squier's RFC.

### B. *Appointments Clause Challenge*

Squier argues for remand because the ALJ was not appointed as required under the United States Supreme Court's holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018). Doc. No. 22 at 4–8. I have addressed this issue before, concluding that Social Security "claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings." *Stearns v. Berryhill*, No. 17-2031, 2018 WL 4380984, at *5 (N.D. Iowa Sept. 14, 2018). Judge Mahoney noted in her R&R that every district court within the Eighth Circuit to consider this issue has reached the same conclusion. *See* Doc. No. 21 at 11–12. Squier seeks reconsideration of this issue in light of contrary decisions in other jurisdictions and an appeal pending before the Eighth Circuit. Doc. No. 22 at 4–5.

In *Lucia*, the Supreme Court held that administrative law judges of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, meaning that the President, a court of law or department head must appoint them. *Lucia*, 138 S. Ct. at 2049. Squier argues that this holding, when combined

---

[9] Squier went on to allege that her "mind" prevented her from being able to work. AR at 224. She does not challenge the ALJ's mental health determinations in the RFC outside of her conversion disorder arguments, and that has been discussed above.

with the lack of an Appeals Council exhaustion requirement under *Sims v. Apfel*, 530 U.S. 103, 112 (2000) ("Claimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues."), permits a claimant to challenge the appointment of a Social Security ALJ for the first time during judicial review. Doc. No. 22 at 4–5. In the alternative, Squier asks for discretionary review of the Appointments Clause challenge under *Freytag v. Commissioner*, 501 U.S. 868 (1991).

In the absence of binding authority to the contrary, I find that Squier's first argument is adequately addressed by our precedent. *See, e.g.*, *Stearns*, 2018 WL 4380984, at *5. Squier presents no new analysis or interpretation of precedent that was not addressed in prior cases. Thus, I again hold that a claimant forfeits his or her Appointments Clause challenge if it is not raised during administrative proceedings.

As for Squier's second argument, I do not accept that this is one of those "rare cases" when review of an Appointments Clause challenge is appropriate under *Freytag*. *See Freytag*, 501 U.S. at 879. Squier outlines the confusion *Lucia* has caused in administrative law and to the Social Security Administration in particular. *See* Doc. No. 22 at 7–8. However, the actions discussed in Squier's objections do not justify a contrary decision, especially one that would be inconsistent with the precedent noted above.

## V. CONCLUSIONS

For the reasons set forth herein:

1. Plaintiff's objections (Doc. No. 22) to the Report and Recommendation (Doc. No. 21) are **overruled.**

2. I **accept** the Report and Recommendation without modification. *See* 28 U.S.C. § 636(b)(1).

3. Pursuant to Judge Mahoney's recommendation:

   a. The Commissioner's disability determination is **affirmed**; and

19

b. Judgment shall enter against plaintiff and in favor of the Commissioner.

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2019.

_____
Leonard T. Strand, Chief Judge